IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FLOYD RAGSDALE,               )
    Plaintiff,                )
                               )
       v.                         )    CIVIL NO. 3:12cv404-JRS
                               )
MICHAEL J. ASTRUE,            )
    Commissioner of Social Security,   )
    Defendant.                )
_____)

## REPORT AND RECOMMENDATION

Floyd Ragsdale ("Plaintiff") is 58 years old and retired as a supervisor after working at

DuPont for 33 years. On February 2, 2009, Plaintiff protectively applied for Social Security

Disability ("DIB") under the Social Security Act (the "Act") with an alleged onset date of

October 3, 2008, claiming disability due to diabetes, neuropathy, hypertension and heart disease.

Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's

requests for benefits. The Appeals Council subsequently denied Plaintiff's request for review on

April 20, 2012.

Plaintiff now challenges the ALJ's denial of benefits, asserting that substantial evidence

did not support the ALJ's assignment of no weight to Plaintiff's treating physician's opinions.

(Pl.'s Mem. of Points and Author. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 9-13.)

Plaintiff further argues that the ALJ should have considered his obesity when determining

whether he was disabled. (Pl.'s Mem. at 14-15.) He also explains that the ALJ failed to properly

evaluate his credibility. (Pl.'s Mem. at 15-19.) Finally, Plaintiff requests this Court to remand

his case based on new evidence provided to the Appeals Council. (R. at 19-21.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 7 & 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges whether substantial evidence supported the ALJ's assessment of the opinions of Plaintiff's treating physician and of his credibility, as well as whether the ALJ should have analyzed Plaintiff's obesity and whether the Appeals Council erred in refusing to review the ALJ's decision upon the presentation of new evidence. Therefore, Plaintiff's education and work history, medical history, treating physician's opinions, state agency non-treating physicians' opinions, reported activities of daily living, the hearing testimony and new evidence are summarized below.

### A. Plaintiff's Education and Work History

Plaintiff completed high school. (R. at 195.) Plaintiff worked at DuPont for 33 years, first as an operator and worked his way up to a supervisor before retiring. (R. at 32.) As a

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

supervisor, Plaintiff held meetings, inspected equipment, wrote procedures, lifted blueprint boxes and carried boxes and manuals. (R. at 32.) At the hearing, Plaintiff testified that he sat for two to three hours total; however, he indicated in a written statement that he sat for 30-35 hours a week. (R. at 47-48, 167.) He would frequently lift 10 pounds. (R. at 167.)

While he was working at DuPont, Plaintiff would occasionally cut trees with his son on the weekends. (R. at 32-33.) Plaintiff testified that he stopped working at DuPont, because his responsibility had grown and his feet hurt. (R. at 50-51.)

**B.     Plaintiff's Medical Records**

In April 2008, Plaintiff visited his primary care physician, G.V. Puster, Jr., M.D., requesting a Department of Transportation ("DOT") physical. (R. at 489.) Dr. Puster informed Plaintiff that he was disqualified from driving commercially, because he took insulin. As a result, Plaintiff changed his medication and began taking Glucophage XR. (R. at 489.) Dr. Puster assessed uncontrolled diabetes mellitus and essential hypertension. (R. at 489.) A few days later, Plaintiff's diabetes was under control without insulin and his blood pressure was well-controlled. (R. at 490.) Dr. Puster completed the DOT form, allowing Plaintiff to drive commercially for one year. (R. at 490.)

On November 28, 2008, an MRI of Plaintiff's left foot revealed soft tissue ulceration at Plaintiff's big toe. (R. at 327.) Due to a bone infection, Plaintiff's left big toe was amputated on December 1, 2008. (R. at 205.) By February 2008, Plaintiff was completely healed from his surgery, was prescribed orthotics and was recommended to return to his normal activities "within the limits of discomfort and swelling." (R. at 477-80.)

In December 2008, Dr. Puster treated Plaintiff for numbness in his toes. (R. at 496.) He assessed Plaintiff with well-controlled hypertension, renal insufficiency, well-controlled non-

insulin dependent diabetes and a history of peripheral edema. (R. at 496.) On January 22, 2009, patient notes indicated that Plaintiff was advised to stop tree work and apply for disability by his orthopedist. (R. at 496.) Plaintiff had no edema, well-controlled hypertension, mild renal dysfunction and uncontrolled diabetes. (R. at 496.) He was asked to return to Dr. Puster in two weeks for a complete physical and a disability assessment. (R. at 496.)

Patient notes on February 5, 2009, documented that Plaintiff applied for disability because of "numbness in his lower legs, feet and ankles" and chronic pain in his right heel, especially when walking excessively or standing. (R. at 524.) Plaintiff also felt that he had decreased stamina, requiring rest after 10 to 15 minutes of vigorous physical activity. (R. at 524.) Dr. Puster summarized Plaintiff's symptoms and noted that he had no headaches, dizziness, chest pain, shortness of breath, abdominal pain, dysuria, hematuria, back or cervical pain, arthritic complaints or pain in the knee or hips. (R. at 524.) Plaintiff had mild pedal edema. (R. at 524.) Dr. Puster assessed that Plaintiff had uncontrolled diabetes mellitus, well-controlled hypertension and mild renal insufficiency with a history of peripheral edema. (R. at 524-25.)

A few weeks later, Plaintiff returned to Dr. Puster to recheck his blood sugar and "for re-evaluation of disability form." (R. at 567.) Dr. Puster completed the Diabetes Mellitus Impairment Questionnaire with Plaintiff's "assistance as far as symptomatology." (R. at 567.) Patient notes indicated pain and numbness in Plaintiff's feet and lower legs and difficulty with physical activity such as walking and stooping — activities that put pressure on Plaintiff's feet. (R. at 567.)

In April 2009, Plaintiff visited Dr. Puster and had no edema, well-controlled hypertension, renal insufficiency and uncontrolled diabetes. (R. at 568.) Dr. Puster increased one of Plaintiff's medications. (R. at 568.)

On June 12, 2009, Allan S. Wax, DPM, FACFAS, wrote a letter explaining that Plaintiff was diagnosed with neuropathy, which made walking and standing difficult. (R. at 561.) He also had chronic pain and decreased sensation in both his feet. (R. at 561.) Dr. Wax opined that Plaintiff's lack of feeling in his feet from his neuropathy made "it difficult for him to work at any job where he would need to stand or walk any length of time." (R. at 561.) This letter was based on his March 23, 2009 examination of Plaintiff, during which Dr. Wax prescribed him Lyrica. (R. at 562.)

In July 2009, Plaintiff visited Dr. Puster and indicated that he checked his feet regularly, had no recent foot ulcers and planned to join a gym to exercise regularly. (R. at 565.) Plaintiff had no edema, much improved non-insulin dependent diabetes, well-controlled hypertension, renal insufficiency and mild anemia. (R. at 565.) Dr. Puster increased Plaintiff's medication. (R. at 565.)

Patient notes indicated on September 8, 2009, that Plaintiff was exercising two to three times a week and had no edema. (R. at 607.) Plaintiff's diabetes was much improved, his hypertension was well-controlled and he continued to have renal insufficiency. (R. at 609.) Two months later, patient notes documented no edema, elevated blood sugar, well-controlled hypertension and an increase in medication. (R. at 609.)

In January 2010, Plaintiff visited Dr. Puster and complained of chest pain, arrhythmia, shortness of breath and slight edema. (R. at 614.) Dr. Puster noted mild pretibial edema, elevated blood sugar, non-insulin dependent diabetes, borderline elevated hypertension and renal

insufficiency. (R. at 614.) Dr. Puster also encouraged Plaintiff to reduce his weight, as well as exercise, and he increased Plaintiff's medication. (R. at 614.)

One month later, Plaintiff requested a physical examination for DOT, stating that he drove a small truck filled with wood. (R. at 615.) Plaintiff had intermittent peripheral edema, well-controlled diabetes, elevated hypertension, mild renal failure and a microscopic hematuria. (R. at 615.) Dr. Puster completed the DOT physical, allowing Plaintiff three months of driving under temporary circumstances. (R. at 615.)

In March 2010, patient notes documented a persistent elevation of blood pressure. (R. at 616.) On April 2, 2010, Plaintiff did not complain of edema, but had controlled hypertension, mild pretibial edema and elevated blood sugar. (R. at 616.) Dr. Puster increased Plaintiff's medications and completed a form "stating that it was ok for [Plaintiff] to resume commercial driving for two years." (R. at 616.) One week later, Dr. Puster listed Plaintiff's "trouble with peripheral edema of the lower legs," easy fatigability, inability to work for prolonged periods of time without becoming tired, inability to walk or lift "significantly," pain and numbness, as well as tingling in his lower legs and feet. (R. at 617.) Plaintiff also had a history of renal insufficiency. (R. at 617.)

Dr. Puster noted Plaintiff's pretibial and pedal edema, as well as decreased pulses in his lower extremities. (R. at 617.) Dr. Puster diagnosed Plaintiff with non-insulin dependent diabetes, well-controlled hypertension, renal insufficiency, peripheral edema, peripheral vascular disease and diabetic nephropathy with numbness and tingling in the feet. (R. at 617.) He also completed a form for disability. (R. at 617.)

## C. The Opinions of G.V. Puster, Jr., M.D., Plaintiff's Treating Physician

On April 14, 2009, Dr. Puster wrote a letter based on Plaintiff's "complete physical examination and evaluation for disability" on April 5, 2009. (R. at 540.) Dr. Puster noted Plaintiff's history of non-insulin dependent diabetes mellitus since 1996, essential hypertension since 2004 and renal insufficiency since 2008. (R. at 540.) Plaintiff's medication included Amaryl, Altace, Januvia, Metoprotol and Lantus. (R. at 540.)

Dr. Puster documented Plaintiff's progressive numbness in his feet, which was a result of his diabetes. (R. at 540.) Due to this numbness, Plaintiff could not detect minor injuries and, in November 2008, required an amputation of his left big toe. (R. at 540.) Dr. Puster listed Plaintiff's symptoms, which included a decrease in sensation in his lower legs and ankles, as well as feet with a decreased circulation in his feet. (R. at 540.) He also had pain in his right heel and ankle when he stood or walked for prolonged periods of time. (R. at 540.) After Plaintiff completed 10 to 15 minutes of physical work, he became fatigued. (R. at 540.)

Upon physical examination, Dr. Puster noted that Plaintiff's blood pressure was well controlled, his weight was 303 pounds, his heart sounds were normal, his lungs were clear, his abdomen was benign and he had no peripheral edema, but also had no pulses in his feet. (R. at 540.) Plaintiff's laboratory work indicated a slight elevation of blood sugar, mild anemia, slight renal insufficiency and well-controlled cholesterol. (R. at 540.) Dr. Puster documented that, after 13 years of diabetes mellitus, Plaintiff began losing his circulation, having peripheral neuropathy and showing signs of mild renal insufficiency, as well as anemia as a result of diabetes. (R. at 540.) Dr. Puster opined that Plaintiff seemed "to be disabled from doing any significant physical work related to fatigue, pain in his heels, and numbness in his feet." (R. at 540.)

On April 28, 2009, Dr. Puster completed a Diabetes Mellitus Impairment Questionnaire, indicating that Plaintiff's first treatment with Dr. Puster was in June 1993 and that Plaintiff visited him every three to four months. (R. at 542.) Plaintiff was diagnosed with type II diabetes with a fair prognosis. (R. at 542.) He had numbness in both feet, swelling in his lower legs and feet and occasional muscle cramping of his legs at night. (R. at 542.) Dr. Puster marked that Plaintiff did not have retinopathy, but had renal insufficiency. (R. at 543.) He listed Plaintiff's symptoms, which included swelling legs, numbness in both lower legs and feet, pain in both ankles and bottoms of feet, and fatigue after vigorous physical activity for more than 10 minutes. (R. at 543.)

As a result of neuropathic complications and infection, Plaintiff's left big toe was amputated. (R. at 544.) Plaintiff took insulin by injection and responded well to medication; however, Dr. Puster wrote that Plaintiff's diabetes was not well-controlled. (R. at 544.) Plaintiff had no side effects from the insulin. (R. at 544.) Dr. Puster marked that Plaintiff could sit for eight hours and stand or walk for one hour during an eight-hour workday. (R. at 545.) He also marked that it was not "necessary or medically recommended" for Plaintiff "not to sit continuously in a work setting." (R. at 545.) Plaintiff could occasionally and frequently lift 10-20 pounds. (R. at 545-46.) Dr. Puster expected Plaintiff's impairments to last for at least 12 months. (R. at 546.) Plaintiff had no emotional problems, was not a malingerer and was capable of moderate stress. (R. at 546.) He had constant pain or fatigue that was severe enough to interfere with his concentration and attention and had "good days" and "bad days." (R. at 546.) Dr. Puster marked that Plaintiff would be absent from work more than three times a month, was limited in pushing, pulling, kneeling, bending and stooping, and needed to avoid temperature extremes. (R. at 546-47.)

8

On July 1, 2010, Dr. Puster wrote another letter discussing Plaintiff's medical maladies. (R. at 611.) Dr. Puster described Plaintiff's bilateral foot numbness, bilateral feet and leg swelling while sitting, pain in his ankles and bottoms of his feet, fatigue after over 10 minutes of rigorous physical activity, occasional muscle cramping at night and renal insufficiency. (R. at 611.) Plaintiff's left big toe was amputated as a result of his diabetes, which was not well-controlled and for which he took insulin. (R. at 611.)

Dr. Puster re-affirmed his April 28, 2009 opinion. (R. at 611.) He opined that those limitations had been present in Plaintiff since October 1, 2008. (R. at 611.) Dr. Puster wrote that the limitations should last for at least 12 more months and render Plaintiff "incapable of sustaining full-time employment in a competitive work environment." (R. at 611.)

## D.    Non-treating State Agency Opinions

On May 22, 2009, Catherine Hower, M.D., a non-treating state agency physician, completed a Physical RFC Assessment and marked that Plaintiff had no exertional limitations, postural limitations, manipulative limitations, visual limitations, communicative limitations or environmental limitations. (R. at 550-53.) She diagnosed Plaintiff with diabetes mellitus and determined that his impairment was non-severe. (R. at 554.)

In October 2009, David Williams, M.D., a non-treating state agency physician, marked that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours during an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull unlimitedly. (R. at 588-92.) Plaintiff could occasionally climb and frequently balance, stoop, kneel, crouch or crawl. (R. at 590.) Dr. Williams marked that Plaintiff had no manipulative, visual, or communicative limitations. (R. at 590-91.) Plaintiff needed to avoid

concentrated exposure to extreme cold, extreme heat and wetness, but had no limitations with humidity, noise, vibrations, fumes or hazards. (R. at 591.)

## E. Plaintiff's Activities of Daily Living

On February 25, 2009, Plaintiff submitted a Pain Questionnaire, indicating that he had constant throbbing pain and some numbness in his feet. (R. at 153-53.) Occasionally, Plaintiff's pain awoke him. (R. at 153.) The pain was worse when he walked for extended periods of time. (R. at 153.) While the pain did not prevent Plaintiff from performing activities, doing so contributed to his pain, which was relieved when he sat with his feet elevated. (R. at 154.)

That same day, Plaintiff completed a Function Report and wrote that he ate meals, watched television, assisted with household chores and rested his feet daily as well as performed outside chores occasionally. (R. at 157, 164.) He marked that he did not take care of anyone except for himself and that he had trouble balancing. (R. at 158.) At night, the pain in Plaintiff's feet occasionally woke him up. (R. at 158.) He did not need help taking care of his personal needs. (R. at 159.)

Plaintiff prepared his own meals weekly, otherwise his wife prepared his meals. (R. at 159.) He could sweep, vacuum, perform minor repairs and rake leaves. (R. at 159.) Plaintiff went outside daily, drove and shopped for fishing parts and household items monthly. (R. at 160.) He enjoyed tinkering with machines, watching television, woodworking and playing cards. (R. at 161.)

Since his alleged onset, Plaintiff became more "combative." (R. at 162.) He marked that his illness affected his ability to lift, walk, climb stairs, squat, kneel and stand. (R. at 162.) Plaintiff indicated that he could lift 15-25 pounds for about 10 minutes, stand for 15-20 minutes, and walk one block or for up to 15 minutes at a time. (R. at 162.) His feet hurt if he stood or

walked for too long and he could lose his balance climbing stairs. (R. at 162.) He could pay attention for 20 minutes at a time, followed written and spoken instructions, handled stress well and got along with authority figures. (R. at 162-63.) Plaintiff had orthotics since December 2008. (R. at 163.)

### F.    Plaintiff's Testimony

On June 18, 2010, Plaintiff testified before an ALJ that he lived with his wife in a two-level home and slept in a bedroom upstairs. (R. at 24-30.) Plaintiff indicated that he was 6'4" tall and weighed 315 pounds. (R. at 30.) About five times a week, he would drive to visit his siblings or go to a restaurant. (R. at 30-31.) He stated that he had not worked anywhere since October 3, 2008, his alleged onset date. (R. at 31.)

Plaintiff's left big toe was amputated and, as a result, he lost his balance regularly. (R. at 33, 45.) He had chronic daily pain and injections in his right shoulder, which helped ease the pain. (R. at 33.) Plaintiff was prescribed pain medication when his toe was amputated, but did not take medication daily for his pain. (R. at 33-34.) His pain was mainly concentrated in his feet and right ankle, but he did not take over-the-counter pain medication. (R. at 34.) Plaintiff rated his pain at a four out of 10. (R. at 34.)

Plaintiff estimated that he could lift or carry 10-15 pounds safely. (R. at 35.) He could stand for 30 minutes before needing to sit and had no issues with sitting. (R. at 35.) However, Plaintiff later testified that he could not sit for extended periods of time, because Plaintiff's feet swelled and hurt when he sat for over an hour, so he had to put his feet up every 30 to 45 minutes. (R. at 42-43.) Plaintiff could walk for about 15-20 minutes at a time, but was never prescribed any assistive devices for walking. (R. at 35.) He stated that the bottom of his feet

were numb. (R. at 44.) He slept for two to three hours a night and napped for up to two hours every day; he took no medication to aid his sleep. (R. at 36.)

Plaintiff used a computer. (R. at 36.) He could shop for groceries, prepare his own food and mow the grass with the riding lawnmower. (R. at 36-37.) Plaintiff testified that he had no hobbies or special interest, but he socialized with friends and family. (R. at 37.) He could take care of his daily needs and occasionally felt nauseous from his medication. (R. at 37-38.) Plaintiff was told by his doctors to stop cutting trees and "avoid walking for extreme periods of time." (R. at 39.)

Plaintiff had not participated in any physical therapy and attempted working out at a gym, but his feet hurt. (R. at 39.) However, when he did go to the gym, he spent 10 minutes on the bicycle and 10 minutes on the treadmill. (R. at 46.)

Plaintiff alleged that he had experienced anxiety attacks. (R. at 40.) He stated that his diabetes was not under control with medication, but he was eating healthy. (R. at 41.) Plaintiff had blurry vision as a result of his diabetes. (R. at 46-47.) He testified that his blood pressure was not controlled by medication. (R. at 42.)

## G.    Medical Evidence Submitted After the ALJ's Decision

On August 31, 2010, Matthew C. Lee, M.D., of eLeete Physicians, LLC, completed a Diabetes Mellitus Impairment Questionnaire. (R. at 620-25.) Dr. Lee indicated that Plaintiff's first day of treatment was May 1998, his most recent exam was August 31, 2010, where he was evaluated, and Plaintiff was treated every one to two months with his primary care physician. (R. at 620.) Dr. Lee diagnosed Plaintiff with type II diabetes with a prognosis that Plaintiff's neuropathy would likely deteriorate and not likely improve at all. (R. at 620.) Plaintiff had pain and numbness in his legs, muscle weakness in his lower extremities and right shoulder, swelling

in his lower legs and feet, leg cramping, loss of manual dexterity and difficulty walking. (R. at 620.)

Dr. Lee marked that Plaintiff had dizziness, episodic vision blurring, kidney problems, frequency of urination, hyper/hypoglycemic attacks, fatigue, general malaise, difficulty thinking and concentrating as well as depression. (R. at 621.) Plaintiff had burning pain, decreased sensation of his lower extremities and difficulty standing from a sitting position. (R. at 621.) Plaintiff's diabetes created vascular complications, neuropathic complications and pain when walking or standing. (R. at 622.) Plaintiff took insulin by injection and responded to the insulin, "but not consistently." (R. at 622.) Dr. Lee indicated that Plaintiff's side effects from insulin included hypoglycemia, sweating, shaking and memory deficit. (R. at 622.)

Dr. Lee opined that Plaintiff could sit, stand or walk for up to one hour during an eight-hour workday and recommended that Plaintiff not sit continuously in a work setting. (R. at 623.) Plaintiff would need to stand and walk around for 10-15 minutes every half hour. (R. at 623.) Dr. Lee made multiple marks on how much Plaintiff could lift, but marked that Plaintiff could occasionally carry five pounds and never carry over five pounds. (R. at 624-25.) Plaintiff's impairments were ongoing and Plaintiff was sensitive to insulin. (R. at 624.) Dr. Lee marked that Plaintiff was incapable of low stress, because he had limited mobility and agility, as well as limited fine motor control. (R. at 624.) Plaintiff was in constant pain and his condition was persistent. (R. at 624.)

Dr. Lee also marked that Plaintiff had limited vision, could not push, pull, kneel, bend or stoop, and needed to avoid wetness, fumes, gases, temperature extremes, humidity, dust and heights. (R. at 625.) Dr. Lee noted that Plaintiff had problems controlling his diabetes and

developed complications from his illness, including neuropathy and an amputation of his left big toe. (R. at 625.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on February 2, 2009, claiming disability due to diabetes, neuropathy, hypertension and heart disease with an alleged onset date of October 3, 2008. (R. at 126, 593.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 66-67.) On June 18, 2010, Plaintiff testified before an ALJ. (R. at 24-58.) On July 14, 2010, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 12-19.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on April 20, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (*See* R. at 1-3.)

## III. QUESTIONS PRESENTED

Was the Commissioner's evaluation of the opinions of Plaintiff's treating physician supported by substantial evidence in the record and the application of the correct legal standard?

Was the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence in the record and the application of the correct legal standard?

Was the Commissioner required to assess the effects of Plaintiff's obesity on his illnesses?

---

[2] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

Did the Appeals Council err by declining to review the ALJ's decision after new evidence was presented to the Council?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial

evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] his physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[4] based on an assessment of the claimant's residual functional capacity ("RFC")[5] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The

---

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since October 3, 2008, his alleged onset date. (R. at 14.) At step two, the ALJ determined that Plaintiff was severely impaired from non-insulin dependent diabetes mellitus, hypertension and status-post left toe amputation. (R. at 14-15.) At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 15-16.)

The ALJ then determined that Plaintiff had the RFC to perform light work, except that he was limited to occasional climbing and must avoid concentrated exposure to heat, cold and wetness. (R. at 16.) The ALJ accepted Plaintiff's statements that he was 76 inches tall and weighed 315 pounds. (R. at 16.) Plaintiff worked at DuPont for 33 years, first as an operator and then worked his way up to a supervisor, but retired because his feet hurt. (R. at 16.) Later, he stated that he left DuPont to cut trees, because it was less stressful and stable. (R. at 16.)

Plaintiff took insulin. (R. at 16.) His left big toe was amputated, resulting in pain, and he had a painful left shoulder, which had undergone injections. (R. at 16.) Plaintiff had daily feet and right ankle pain. (R. at 16.) He rated his pain at a four on a scale from one to 10. (R. at 16.) Despite his pain, he did not take medication daily, but he took aspirin occasionally. (R. at 16.)

Plaintiff did not participate in physical therapy nor did he attend the gym, because it bothered his feet. (R. at 17.) He was permanently restricted from performing tree work and prolonged walking. (R. at 17.) Plaintiff did not visit a psychiatrist. (R. at 17.) Plaintiff's diabetes was not controlled and he was not on a diet. (R. at 17.) His blood pressure was controlled. (R. at 17.) Plaintiff alleged that his feet would become numb, lack sensation and become pained. (R. at 17.) He testified that he could lift 10-15 pounds, sit, walk for 15-20 minutes and stand for 30 minutes. (R. at 17.) Plaintiff slept two to three hours a night with one to two hour naps daily; he took no sleep aids. (R. at 17.) Plaintiff also drove, shopped for groceries, prepared meals, used a riding lawn mower to cut his grass, socialized, repaired his house, repaired small mechanical engines, woodworked and played cards. (R. at 17.) The ALJ determined that Plaintiff was less than credible. (R. at 17.)

The ALJ then summarized Plaintiff's medical records, such as his complaints of diabetes-related issues, including decreased circulation in his feet, pain in his right heel and ankle when he was on his feet, and fatigue after 10-15 minutes of vigorous physical work. (R. at 17.) The ALJ noted that these complaints were not supported by the longitudinal record. (R. at 17.) While Plaintiff's left big toe was amputated, his gait had not changed. (R. at 17.) Plaintiff's blood sugar levels improved with monitoring and medication. (R. at 17.) The ALJ noted that neither Plaintiff's treatment nor his condition changed significantly since his alleged onset date. (R. at 17.) Plaintiff changed his diet, exercised and returned to work. (R. at 17.)

The ALJ determined that Plaintiff was capable of occasionally climbing, lifting 10 pounds frequently and 20 pounds occasionally, as well as standing, walking or sitting for six hours in an eight-hour work day, but he must avoid concentrated exposure to heat, cold and wetness. (R. at 17.) The ALJ also noted that Plaintiff was cleared to drive a commercial truck for two years, with only his elevated blood sugar indicated as a problem. (R. at 18.)

The non-treating state agency physicians' opinions were assigned appropriate weight, because they "indicated that the claimant [had] the necessary mental and physical residual functional capacity to perform work." (R. at 18.) The ALJ gave Dr. Puster's opinion no weight, "because it is not consistent with the claimant's testimony and statements regarding his actual activity level and his own treatment notes." (R. at 18.) Additionally, "the claimant assisted in the completion of Dr. Puster's assessment of limitations that does not appear to have been based on diagnostic and clinical findings but the claimant's subjective complaints." (R. at 18.) Finally, despite his medical opinion, Dr. Puster nonetheless approved Plaintiff to resume commercial truck driving. (R. at 18.)

At step four, the ALJ assessed that Plaintiff was capable of performing his past relevant work as a maintenance coordinator. (R. at 18-19.) The ALJ therefore found that Plaintiff had not been under a disability under the Act from October 3, 2008. (R. at 19.)

Plaintiff asserts that the ALJ did not properly follow the treating physician's rule. (Pl.'s Mem. at 9-13.) He also alleges that the ALJ failed to properly evaluate his credibility. (Pl.'s Mem. at 15-19.) Plaintiff further argues that the ALJ should have considered his obesity. (Pl.'s Mem. at 14-15.) Finally, Plaintiff requests this Court to remand this case based on new evidence provided to the Appeals Council. (R. at 19-21.) Conversely, the Commissioner argues that substantial evidence supported a finding that Plaintiff's impairments were not disabling under the

Act. (Def.'s Mot. for Summ. J. and Brief in Supp. Thereof ("Def.'s Mem.") at 12-23.) He also asserts that the ALJ properly considered Plaintiff's maladies under the regulations and that remand is not necessary for consideration of Plaintiff's new evidence. (Def.'s Mem. at 12-24.)

**A.    The ALJ did not err in assigning the opinions of Plaintiff's treating physician less than controlling weight.**

Plaintiff first argues that the ALJ's reasons for assigning Dr. Puster's opinions no weight were not specific enough and frustrates judicial review. (Pl.'s Mem. at 10.) He argues that the ALJ's assignment was not supported by substantial evidence, because Dr. Puster objectively found numbness and swelling as well as muscle cramping and renal insufficiency; therefore, his opinions should have been assigned controlling weight. (Pl.'s Mem. at 11-12.) Plaintiff argues that the ALJ did not adopt the opinion of any physician, but rather "relied entirely on his own impermissible lay interpretation of the medical records." (Pl.'s Mem. at 11.) Finally, Plaintiff asserts that he should have been assigned a sedentary RFC. (Pl.'s Mem. at 13.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques; and, (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

The ALJ succinctly explained his reasons for assigning Dr. Puster's opinions no weight: "because it is not consistent with the claimant's testimony and statements regarding his actual activity level and his own treatment notes," because "the claimant assisted in the completion of Dr. Puster's assessment of limitations that does not appear to have been based on diagnostic and clinical findings but the claimant's subjective complaints," and because Dr. Puster approved Plaintiff to resume commercial truck driving. (R. at 18.) This assessment was supported by substantial record in the record.

First, when Dr. Puster completed the disability forms, he required Plaintiff's "assistance as far as symptomatology." (R. at 567.) This supports the ALJ's assertion that "the claimant assisted in the completion of Dr. Puster's assessment of limitations that does not appear to have been based on diagnostic and clinical findings but the claimant's subjective complaints." (R. at 18.)

Next, Dr. Puster signed off on Plaintiff's ability to drive commercially three times — in April 2008, February 2010 and April 2010. (R. at 490, 615-16.) More telling is the fact that Dr. Puster completed the DOT form during an April 2, 2010 visit, where patient notes only documented mild pretibial edema and elevated blood sugar. (R. at 616.) However, only one week later, patient notes reflected Plaintiff's "trouble with peripheral edema of the lower legs," easy fatigability, inability to work for prolonged periods of time without becoming tired, inability to walk or lift "significantly," pain, numbness and tingling in his lower legs and feet. (R. at 617.)    Dr. Puster also observed Plaintiff's pretibial and pedal edema, as well as his decreased pulses in his lower extremities. (R. at 617.) Dr. Puster diagnosed Plaintiff with non-insulin dependent diabetes, well-controlled hypertension, renal insufficiency, peripheral edema, peripheral vascular disease and diabetic nephropathy with numbness and tingling in the feet. (R. at 617.) Finally, at this visit, one week after completing a DOT physical form that allowed Plaintiff to drive commercially for two years (R. at 616), Dr. Puster completed a form for disability (R. at 617).

Then in July 2010, Dr. Puster re-affirmed his opinions from April 28, 2010, and indicated that those limitations had been present in Plaintiff since October 1, 2008. (R. at 611.) More specifically, Dr. Puster had marked that Plaintiff could sit for eight hours and stand or walk for one hour during an eight-hour workday. (R. at 545.) He also marked that it was not "necessary or medically recommended" for Plaintiff "not to sit continuously in a work setting." (R. at 545.) Plaintiff could occasionally and frequently lift 10-20 pounds. (R. at 545-46.) Dr. Puster expected Plaintiff's impairments to last for at least 12 months. (R. at 546.) Plaintiff had no emotional problems, was not a malingerer and was capable of moderate stress. (R. at 546.) He had constant pain or fatigue that was severe enough to interfere with his concentration and

attention and had "good days" and "bad days." (R. at 546.) Dr. Puster marked that Plaintiff would be absent from work more than three times a month, was limited in pushing, pulling, kneeling, bending as well as stooping, and needed to avoid temperature extremes. (R. at 546-47.)

A few months after Plaintiff's amputation, Plaintiff's surgeon recommended Plaintiff to return to his normal activities "within the limits of discomfort and swelling." (R. at 477-80.) Patient notes on February 5, 2009, documented that Plaintiff applied for disability because of "numbness in his lower legs, feet and ankles" and chronic pain in his right heel, especially when walking excessively or standing. (R. at 524.) Plaintiff also felt that he had decreased stamina, requiring rest after 10 to 15 minutes of vigorous physical activity. (R. at 524.) In July 2009, Dr. Puster noted that Plaintiff had planned on joining a gym and exercising regularly. (R. at 565.) He observed in September 2009 that Plaintiff exercised two to three times a week and did not have any edema. (R. at 607.) Finally, in January 2010, Dr. Puster encouraged Plaintiff to reduce his weight and exercise. (R. at 614.) These patient notes corroborated Plaintiff's testimony that when he did go to the gym, Plaintiff spent 10 minutes on the bicycle and 10 minutes on the treadmill. (R. at 46.)

None of this evidence supported the extreme limitations that Dr. Puster attached to Plaintiff, but it did support a rejection of Dr. Puster's opinions. While Dr. Puster occasionally documented Plaintiff's allegations of his physical limitations, he also encouraged Plaintiff to exercise. While the ALJ must generally give more weight to a treating physician's opinion, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). Since its decision in *Hunter*, the Fourth Circuit has consistently held that, "[b]y negative

implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."[6] *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2).

Finally, Plaintiff argues that the ALJ improperly relied on his own lay interpretation of the medical records and that he should have found that Plaintiff was only capable of performing sedentary work. (Pl.'s Mem. at 11, 13.) *Farrar v. Astrue*, No. 3:11cv457-JAG, 2012 WL 3113159, at *10-11 (E.D.Va. July 13, 2012) is inapposite, as the ALJ in *Farrar* assessed a greater RFC than any medical opinion in the record and dismissed the physician's opinions without sufficient explanation. Here, however, the ALJ properly determined Plaintiff's RFC, as the ALJ was not required to seek a separate medical opinion despite the conflicting opinions in the record. *See Mays v. Barnhart*, No. 02-4520, 78 F. App'x 808, 813 (3d Cir. Oct. 27, 2003) ("[T]he ALJ is responsible for making a residual functional capacity determination based on the medical evidence, and he is not required to seek a separate expert medical opinion.").

## B.     The ALJ did not err while assessing Plaintiff's credibility.

Next, Plaintiff argues that the ALJ used an incorrect standard when evaluating his credibility, as he failed to review the evidence as a whole. (Pl.'s Mem. at 17.) In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at

---

[6] If a medical opinion is not assigned controlling weight by the ALJ, then the ALJ assesses the weight of the opinion by considering: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area which an opinion is rendered; and (6) other factors brought to the Commissioner's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). As explained in the text above, while Dr. Puster was Plaintiff's treating physician, numbers three and four support the ALJ's assignment of no weight to his opinions, as they were not supported by relevant evidence and were inconsistent with the record.

594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Craig*, 76 F.3d at 594; SSR 96-7p, at 1-3. In doing so, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13.

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the Plaintiff's impairments and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms. The ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

The ALJ summarized Plaintiff's medical records, such as his complaints of diabetes-related issues, including decreased circulation in his feet, pain in his right heel and ankle when he was on his feet, and fatigue after 10-15 minutes of vigorous physical work. (R. at 17.) The ALJ noted that these complaints were not supported by the longitudinal record. (R. at 17.) While Plaintiff's left big toe was amputated, his gait had not changed. (R. at 17.) Plaintiff's blood sugar levels improved with monitoring and medication. (R. at 17.) The ALJ noted that neither Plaintiff's treatment nor his condition changed significantly since his alleged onset date. (R. at 17.) Plaintiff changed his diet, exercised and returned to work. (R. at 17.)

First and foremost, Plaintiff continuously requested Dr. Puster to complete a DOT physical, so he could drive commercially. (*See* R. at 489-90, 615-16.) Once he learned that he could not drive commercially while on insulin, Plaintiff requested and obtained a change in

medication from insulin to Glucophage XR. (R. at 489.) This change not only allowed him to drive commercially, but also kept his diabetes under control on many occasions. (*See* R. at 489-90, 496, 565, 609, 615.)

Next, and as explained above, Plaintiff was encouraged to exercise by Dr. Puster and did, in fact, exercise. Despite testimony that Plaintiff had to put his feet up every 30 to 45 minutes to reduce swelling (R. at 42-43), Plaintiff kept busy performing minor repairs around the house and raking leaves (R. at 159). Plaintiff went outside daily, drove and shopped for fishing parts and household items monthly. (R. at 160.) His hobbies included tinkering with machines, watching television, woodworking and playing cards. (R. at 161.) Additionally, on many visits to Dr. Puster, Plaintiff did not have edema. (R. at 496, 565, 568, 607, 609.)

As long as substantial evidence supported the conclusion, this Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). Substantial evidence did exist to support the ALJ's credibility determination.

## C.    The ALJ did not err in not addressing Plaintiff's obesity.

Plaintiff argues that his obesity was not properly considered. (Pl.'s Mem at 14-15.) Plaintiff did not allege that he was disabled as a result of obesity (*see* R. at 593), nor did Dr. Puster make such an allegation (*see* R. at 525-34, 540-47, 565-70, 582-84, 603-07, 609-17). While Dr. Puster did encourage Plaintiff to reduce his weight as well as exercise and increased Plaintiff's medication (R. at 614), obesity was only identified as Plaintiff's medical condition twice by other doctors. (R. at 211, 261.)

The medical evidence did not discuss whether Plaintiff's obesity had an effect on his ability to work. On the contrary, physicians explained that Plaintiff's neuropathy was a result of

his diabetes and the main cause of Plaintiff's limitations to walk and stand. (*See* R. at 540, 561.) In fact, Dr. Puster was so unconcerned about Plaintiff's weight, that he rarely documented it. (*See, e.g.,* R. at 488-93.) It is almost impossible to consider the amplifying effects of Plaintiff's obesity if his medical records did not document such information. *See Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) ("Although his treating doctors noted that [the plaintiff] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions."). Because Plaintiff's medical records did not discuss Plaintiff's obesity and because Plaintiff did not allege that he was disabled due to his obesity, the ALJ did not err when he did not consider Plaintiff's obesity in his decision.

**D.    The Appeals Council did not err when it refused to review the ALJ's decision once it received new evidence.**

Plaintiff requests that the Court remand his case to allow the Commissioner to weigh and resolve the opinion evidence presented by Plaintiff after the ALJ's decision. (Pl.'s Mem. at 19-21.) In determining whether the ALJ's decision was supported by substantial evidence, a court cannot consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (internal citations omitted). However, the Act allows a court to remand a case for reconsideration in two situations. 42 U.S.C. § 405(g). One type of remand is a "sentence six" remand, which provides that a court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*; *see also Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (a reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of

disability at the time the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence).

The other type of remand is a "sentence four" remand, which provides that a "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing." *Id.* If new evidence was submitted to the Appeals Council, the evidence must be new and material for a case to be remanded to the ALJ. *Wilkins v. Sec'y Dept. of Health and Human Servs.*, 953 F.2d 93, 96 n.3 (4th Cir. 1991). New evidence is not duplicative or cumulative. *Id.* at 96. Evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him. *Id.*

In the case at hand, Plaintiff's new evidence is not material and therefore does not justify remand. Dr. Lee's opinion detailed more limitations than Dr. Puster's opinions which, as discussed above, were not supported by substantial evidence in the record. (*Compare* R. at 620-25 *with* R. at 540, 542-47, 611.) In fact, Dr. Lee's opinion contained information about Plaintiff that was substantially inconsistent with the medical records. For example, Dr. Lee wrote that Plaintiff took insulin by injection and responded to the insulin, "but not consistently." (R. at 622.) He further indicated that Plaintiff's side effects from insulin included hypoglycemia, sweating, shaking and memory deficit. (R. at 622.) However, Plaintiff stopped taking insulin and began taking Glucophage XR in April 2008, so he could qualify for commercial driving under the DOT. (*See* R. at 489.)

Because Dr. Lee's opinion was not supported by substantial evidence in the record and contradicted other evidence in the record, it was not material and did not warrant a remand to the ALJ for its consideration. Therefore, the Appeals Council did not err when it denied review of Plaintiff's claim.

## VI. CONCLUSION

For the reasons set forth herein, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 7 & 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated:  December 20, 2012